# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No. CR 03-2177 JB

JOSE PEREA,

       Defendant.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on the Defendant's[1] Motion to Suppress, filed February 6, 2004 (Doc. 35). The Court held a hearing on this motion on March 15, 2004. The Court entered an Order denying the motion on April 13, 2004 (Doc. 54). In footnote 1 of that Order, the Court promised to issue a memorandum opinion explaining the reason for its decision to deny the Defendant's Motion to Suppress.[2]

## FACTUAL BACKGROUND

On October 5, 2003, at approximately 6:30 p.m., Albuquerque Police Department ("APD") Officer Jeremy Bassett and Drug Enforcement Administration ("DEA") Special Agent Kevin Small were conducting an interdiction investigation. See Transcript of Hearing at 9:17 - 10:5 (taken March

---

[1] After the filing and hearing of this motion, the United States filed a superseding indictment listing "Jose Perea" as an alias for "Fabian Burciaga-Burciaga." For the purposes of consistency, the Court will refer to the Defendant as Jose Perea in the parts of the evidence in which he is so referred.

[2] The Court began this opinion before it entered judgment, but because of oversight and the press of business, the Court was unable to timely complete this opinion. This opinion is merely intended to explain more fully in writing some of the reasons that the Court orally gave at the sentencing.

15, 2003)(Bassett);[3] id. at 165:4-7 (Small).  At that time, Small observed a red Cadillac Escalade, New Mexico license number "UNM 5558," parked in the parking lot of Flying J Truck Stop located near Interstate 40 and 98th Street.  See id. at 12:18 - 13:3 (Bassett); id. at 25:3-9 (Bassett); id. at 165:6 - 166:2 (Small).  Small observed Perea walking back to a Cadillac Escalade from the store carrying a bag of groceries.  See id. at 12:5-15 (Bassett); id. at 33:10-18 (Bassett).

Approximately one hour later, Small and Bassett, from inside the store, observed the same Escalade circling the parking lot.  See id. at 13:13 - 15:5 (Bassett).  The driver stopped the Escalade in the parking lot, facing east.  See id. at 15:10-20 (Bassett); id. at 165:14 - 166:2 (Small).  Small and Bassett observed a man -- later identified as James Estrada -- walk briskly toward the Escalade and approach the driver's side window.  See id. at 16:5-18 (Bassett); id. at 166:3-7 (Small).  Bassett was positioned a short distance away from the driver's side of the vehicle.  See id. at 16:20-22 (Bassett); id. at 39:9-11(Bassett).  Bassett observed Estrada reach inside the driver's side window, which was rolled down.  See id. at 16:17-19 (Bassett); id. at 38:7-8 (Bassett).  Bassett then saw the Escalade's driver open the door and place a white, billiard-ball size object in Estrada's hand.  See id. at 17:3-11 (Bassett).  From Bassett's vantage point, when the driver opened the door, Bassett was able to observe who was driving the Escalade -- later identified as Jose Perea.[4]  See id. at 17:14-21 (Bassett); id. at 37:6-15 (Bassett).  Bassett recognized the Escalade's driver as the man he observed earlier exiting the store with a bag of groceries.  See id. at 37:16-21 (Bassett).  Small, who had positioned

---

[3] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

[4] As mentioned above, *supra* note 1, the United States later identified the Defendant in its superceding indictment as Fabian Burciaga-Burciaga, with an alias of Jose Perea.  For the purposes of this opinion, Jose Perea and Fabian Burciaga-Burciaga are the same person.

himself on the Escalade's passenger side, had difficulty seeing inside the vehicle because the windows were heavily tinted.  See id. at 166:7-23 (Small).  He did, however, observe movement in the passenger's seat.  See id. at 166:18-22 (Small).

Suspecting a narcotics transaction, Bassett began to approach the Escalade.  See id. at 18:2-4 (Bassett).[5]  Bassett and Small, however, then observed a green pickup truck drive up to the Escalade. See id. at 18:5-6 (Bassett); id. at 38:12-23 (Bassett); id. at 166:12-17 (Small).  The green truck's driver stopped along side the Escalade, approximately three feet away from the Escalade's driver's side window, aligning the driver's side windows of the two vehicles.  See id. at 18:5-6 (Bassett); id. at 38:12-23 (Bassett); id. at 166:15-17 (Small).  Bassett observed two people inside the green truck. See id. at 39:16-18 (Bassett).  Bassett and Small heard an argument between the persons in the Escalade and the green truck, although they could not understand what was said.  See id. at 18:7-17 (Bassett); id. at 39:24 - 40:9 (Bassett); id. at 166:25 - 167:5 (Small).  Both vehicles then left the parking lot in opposite directions at a high rate of speed.  See id. at 18:24 - 19:1 (Bassett); id. at 167:5-7 (Small).  Small and Bassett followed Estrada back inside the store, where Estrada made contact with a female -- later identified as Patricia Estrada -- who was sitting at a table eating.  See id. at 19:1-10 (Bassett);  id. at 41:15-17 (Bassett); id. at 168:13-20 (Small).  James and Patricia Estrada picked up the food from the table, threw it in the trash, and left the store.  See id. at 19:15-19 (Bassett); id. at 41:19-20 (Bassett); id. at 168:19-22 (Small).

In the parking lot, Small confronted the Estradas in front of their vehicle and identified himself

---

[5] Bassett testified that he had been involved in over a hundred narcotic investigations and that at least half of them involved a firearm or some weapon.  See Transcript of Hearing at 27:1-10 (Bassett).  Bassett also stated, however, that there was no specific evidence that Perea had a firearm on the night of the October 5th narcotics transaction.  See id. at 55:11 - 56:7 (Bassett).

as a DEA agent.  See id. at 20:3-4 (Bassett); id. at 169:7-11 (Small).  For officer safety reasons, Bassett positioned himself behind the vehicle.  See id. at 20:3-6 (Bassett).  Small asked permission to speak with Estrada and, when Estrada agreed, asked to see identification.  See id. at  42:1 (Bassett); id. at 169:13-16 (Small).  Estrada produced a New Mexico driver's license identifying him as James Estrada.  See id. at 169:17-18 (Small).  Small observed that Estrada was acting very nervous, could not stand still, and looked uncomfortable.  See id. at 169:23 - 170:1 (Small).  Bassett then approached Estrada, identified himself as a police officer, and asked Estrada for permission to "pat him down" for weapons.  See id. at 20:14-22 (Bassett).  Estrada told the officers that they could pat him down and that he did not have any weapons.  See id. at 20:23-25  (Bassett).  During the pat down, Bassett felt an object the size of a billiard ball in Estrada's left front pocket.  See id. at 21:6-7 (Bassett).  The object felt like it was wrapped in plastic.  See id. at 21:10-12 (Bassett).

With his training, education, and experience, Bassett was of the opinion that the earlier transaction he had witnessed between Perea and Estrada was a transfer of drugs, possibly cocaine, in exchange for money.  See id. at 23:4-5 (Bassett).  Because the bulge in Estrada's pocket was wrapped in plastic, the packaging was consistent with other seizures that Bassett had made of cocaine.  See id.  Bassett then asked Estrada what was in his pocket and if Bassett could take it out. See id. at 21:20-21 (Bassett).  Estrada said, "yes."  See id. at 21:22-23 (Bassett).  Bassett removed what was later identified as cocaine.  See id. at 21:24 - 22:15 (Bassett); id. at 42:4-6 (Bassett). Bassett placed Estrada under arrest and asked him where he got the cocaine.  See id. at 23:5-12 (Bassett).  Estrada told the officers that it came from the Escalade's driver and that the driver's name was "Fabian."  See id. at 23:11-17 (Bassett).  Estrada explained that he was a "middleman" between the Escalade's driver and the green truck's driver, because the two drivers did not get along.  See id.

-4-

at 23:18-24 (Bassett); id. at 42:22 - 43:3 (Bassett).  Estrada also told the officers that the Escalade's

driver handed Estrada the cocaine from the center console.  See id. at 43:8-9 (Bassett).

When Bassett attempted to find out the identities of the parties in the vehicles, Estrada began

to ramble.  See id. at 24:10-12 (Bassett).  Other than describing the Escalade's driver as "Fabian,"

Estrada did not provide any names.  See id.  At one point, however, Estrada stated that one of the

persons in one of the vehicles was possibly wanted in connection with a vehicular homicide of a police

officer.  See id. at 24:12-16 (Bassett); id. at 43:17-23 (Bassett).

Bassett then put out an attempt to locate[6] ("ATL") on the Escalade.  See id. at 24:18-19

(Bassett).[7]  In the ATL, the Escalade was described by its license number, color, and rims.  See id.

at 25:6-9 (Bassett).  The ATL described the Escalade's driver as a Spanish male adult ("SMA") with

a shaved head and a small ponytail at the back of this head.  See id. at 25:20-23 (Bassett).  The ATL

also listed a possible alias for Perea as "Fabian."  See id. at 45:11-14 (Bassett).  Bassett also included

that, based on Small's observations of movement in the passenger's seat, there was a passenger in

the Escalade.  See id. at 25:11-17 (Bassett).  Bassett testified that he also put out an ATL on the

green truck, describing it as a green Dodge pickup with a camper shell occupied by two people, both

Spanish male adults.  See id. at 25:24 - 26:3 (Bassett).

According to Bassett's testimony, he told the dispatcher that one of the drivers in one of the

---

[6] According to Bassett, an "attempt to locate" is when an officer provides a dispatcher
information and the dispatcher re-broadcasts that information throughout the city to other officers.
See Transcript of Hearing at 24:22 - 25:2 (Bassett).

[7] At the hearing, Bassett testified that he put out the ATL after Small and Bassett detained
and arrested Estrada.  See Transcript of Hearing at 40:10 - 41:14 (Bassett).  Bassett's police report,
however, states that Bassett issued the ATL before speaking with Estrada.  See id.  While Perea
pointed out this discrepancy at the hearing, the Court does not believe it is material when the ATL
was issued.

vehicles was wanted for homicide.  On cross examination, however, Perea's counsel elicited the

following testimony from Bassett:

> [PEREA'S ATTORNEY] Q. . . . Maybe I'm missing the point.  You do [sic] the
> driver as a possible [warrant for a homicide]. . . .
>
> [BASSETT] A.   What I stated to dispatch, that one of the subjects in the vehicle --
>
> Q.   The green vehicle?
>
> A.   I didn't say.  I didn't specify which one, because there was the driver of the
> Escalade, which . . . Mr. Estrada described as Fabian, and then Agent Small told me
> there was a second subject in the Escalade.  Mr. Estrada didn't specify to me which
> vehicle the person who was wanted for a homicide was in.  As I described it over the
> air, that's what I had stated.
>
> Q.   So what comes out over the air, then, is a green Dodge pickup truck, license
> unknown, driver of both vehicles possibly wanted in a homicide or --
>
> A.   I just -- What I had told her is that one of the subjects was possibly wanted for
> . . . a homicide.
>
> * * * *
>
> Q.   But the CAD's was attached, was it not, Officer Bassett, to the green truck?
>
> A.   I'm sorry, could you restate that?
>
> Q.   The homicide part was attached, as it comes out over the CAD's, to the green
> truck, was it not?
>
> A.   Yes, sir, it was.  Yes, sir, it was.

See Transcript of Hearing Excerpt at 2:4 - 3:5 (Bassett).[8]  On re-direct, the United States asked the

following questions whether Bassett specifically connected the homicide suspect to the green truck:[9]

---

[8] Direct quotations from the transcript of the hearing are in the Court Reporter's finalized
versions and are filed in the record as an excerpt.

[9] In his cross of APD Officer James Harvey, who heard the ATL broadcast while en route to
the Flying J, Perea's counsel solicited testimony about the dispatcher's report and the homicide

[THE UNITED STATES] Q. . . . [T]here's an indication there that the subject that was driving the green Dodge pickup may be wanted for a [homicide]; is that right?

[BASSETT] A.   Yes, sir.

Q.   Okay.  Now, that was inconsistent with what you orally told this person, correct?

A.   Yes, sir.

Transcript of Hearing Excerpt at 3:24 - 4:6 (Bassett).  To further clarify Bassett's testimony, the

following exchange occurred at the hearing between the Court and Bassett:

THE COURT:  . . . Mr. Bassett, let me ask you, did I understand your testimony correctly, that when Mr. Estrada told you about the officer being . . . [involved in a vehicular] homicide, that you connected what he was saying with the green truck?

THE WITNESS:  No, sir.  He stated that one of the people -- or the persons in the vehicles was wanted.  Because I was trying to get names.

THE COURT:  You didn't make any connection in your mind as to which one he was talking about?

THE WITNESS:  To which vehicle?

THE COURT:  Yes.

THE WITNESS:  No, sir.  No.  I was trying to get the names of the people that I could, you know, identify or give on the attempt-to-locate. . . . He stated the one as Fabian; then he started to discuss the other subjects, and then he stopped and said, "Okay, you know the people that were wanted."  And that's how he described it to me.

* * * *

THE COURT:  Did you say anything to Mr. Harvey that would cause him to think that you associated the homicide with the driver of the green truck?

THE WITNESS:  Not specifically, no.  I stated the subjects were in both vehicles,

---

suspect.  Harvey testified that, according to the dispatcher's report, the Escalade's and its driver's description had already been broadcast for three minutes before there was any mention of the green truck and the possible homicide suspect.  See Transcript of Hearing at 121:19 - 123:16 (Harvey).

because it was an attempt to locate on both vehicles.  There's multiple subjects in both
vehicles.  I didn't know which one.

See Transcript of Hearing Excerpt at 4:9 - 5:1; id. at 5:9-15 (Bassett).

After issuing the ATL, Bassett requested a marked unit respond to the Flying J Truck Stop.
See id. at 26:5-7 (Bassett).  APD Officer Jason Harvey was one of the officers dispatched to the
scene in a marked police car.  See id. at 27:11-14 (Bassett); id. at 48:10-12  (Bassett); id. at 48:25 -
49:2 (Bassett).  When Harvey arrived, Bassett asked him if he heard the ATL, to which Harvey
responded that he had.  See id. at 49:13-18 (Bassett); id. at 75:22-24 (Harvey).  At the hearing,
Harvey testified that the ATL informed him that one of the suspects in one of the vehicles was wanted
for homicide.  See id. at 76:5-8 (Harvey).  Bassett then told Harvey that Bassett witnessed what he
believed to be a narcotics transaction between a Cadillac Escalade and another vehicle.  See id. at
76:11-22 (Harvey); id. at 116:24 - 117:6 (Harvey).  Bassett provided Harvey a description of both
vehicles, including the Cadillac Escalade's make, color, license plate, and large tires and rims.  See
id. at 77:21 - 78:5 (Harvey).  Bassett also informed Harvey that the Escalade's driver was a Hispanic
male with a shaved head and a little pony tail at the back of his head.  See id. at 78:1-9 (Harvey).

In addition, Bassett told Harvey that one of the vehicles' occupants was a homicide suspect,
but that he did not know which vehicle contained the homicide suspect.  See id. at 77:2-7 (Harvey).
At the hearing on this motion, when Perea's counsel asked Harvey what information Bassett provided
him on the homicide suspect, the following exchange occurred:

> [PEREA'S ATTORNEY] Q. . . . And [Bassett] also told you that one of the suspects,
> that he had apprehended, or Estrada had talked about a homicide; is that right?
>
> [HARVEY] A.   Yeah. . . . I didn't know anything about this individual that you're
> referring to as Estrada. . . . [Bassett] just told me that there was a suspect in one of
> the vehicles that was possibly involved with a homicide.

-8-

Q.  And did [Bassett] say anything about the homicide to you?  Did he say that it was -- that he had found that out from [Estrada] and --

A.  No.

Q.  -- it involved a police officer?

A.  No.

Q.  Did he tell you anything about how this person had supposedly been drug down the highway, or something like that?

A.  He didn't tell me anything.

Q.  So the only thing you knew was a possible somebody that was in a car, in one of these vehicles --

A.  Correct.

Q.  -- was possibly involved in a homicide?

A.  Wanted for a homicide.

Q.  Wanted for a homicide?  Because, is that what --

A.  The 29 means.

Q.  -- the 29 means --

A.  Correct.

Q.  -- wanted for a homicide?  But the homicide that you're aware of, you didn't know if that was by a vehicle, as in vehicular homicide?

A.  I did not know that.

Q.  You didn't know if it was a homicide by accident?  There was nothing about a gun mentioned, in other words, was there?

A.  No.

Transcript of Hearing Excerpt at 5:19 - 7:1 (Harvey).  When Bassett, however, testified about

informing Harvey of the homicide suspect, Perea's counsel elicited the following testimony on cross-examination:

> [PEREA'S ATTORNEY] Q. . . . All right.  And you then . . . inform Harvey [what] Estrada told you about the green vehicle and the homicide and the guy possibly running over the guy down in Belen, or something like that?
>
> [Bassett] A.   Yes, sir.
>
> Q.   All right.  So he's aware of that?
>
> A.    He's aware that one of the subjects in the vehicles is possibly wanted for a homicide, yes, sir.
>
> Q.   But this homicide, that you're talking about down in Belen, does not involve a gun, right?
>
> A.   No, sir.

Transcript of Hearing Excerpt at 3:9-20 (Bassett).  The Court, in its question of Bassett, solicited the following response from Bassett on whether he told Harvey how the homicide occurred:

> THE COURT:  When you talked to Mr. Harvey, did you tell Mr. Harvey that the homicide that Mr. Estrada had referred to occurred by dragging?
>
> THE WITNESS:  I had stated that it was a homicide, but, yeah, they had run over somebody.  I don't know if I used the word "dragging," but, yes, that he had run over someone.  That's what Estrada told me.

Transcript of Hearing Excerpt at 5:2-8 (Bassett).

After receiving the briefing, Harvey left the scene and attempted to locate either the Escalade or green truck.  See id. at 77:9-10 (Harvey); id. at 124:7-16 (Harvey).  Harvey was unsuccessful at locating either vehicle and "cleared," or stopped, his search approximately twenty-eight minutes after he first arrived at the Flying J Truck Stop.  Id. at 115:21 - 116:19 (Harvey).  The Escalade was not located the evening of October 5, 2003.  See id. at 27:22-25 (Bassett).

-10-

Although Harvey did not locate either vehicle on the evening on October 5, 2003, on approximately October 8th or October 9th,[10] Harvey testified that he stopped another vehicle that matched the ATL description of Perea's Escalade. See id. at 78:21-25 (Harvey); id. at 128:7-12 (Harvey). Sometime between 9 p.m. and 11 p.m., another officer saw a maroon Cadillac Escalade with tinted windows and large rims. See id. at 128:18 - 129:7 (Harvey). This Escalade -- unlike the one from the October 5th incident -- had no license plate. See id. at 128:21 (Harvey). Harvey, along with approximately three or four other police cars, conducted a "felony stop" of the Escalade based on its similar description to that of the ATL from the suspected drug transaction on October 5, 2003. Id. at 129:3-12 (Harvey). Harvey testified that the officers' "felony stop" on this Escalade was exactly the same as the stop involving Perea a few days later. See id. at 129:15-17 (Harvey). Harvey checked the driver's identification and discovered it was not Perea. See id. at 129:11-12 (Harvey). After asking permission, Harvey searched the vehicle. See id. at 129:12-14 (Harvey).

In the early evening of October 11, 2003, Harvey saw another Escalade -- later identified as the one in question -- heading in the opposite direction on Central between 98th Street and Unser. See id. at 79:1-9 (Harvey). Harvey testified that, although it was in the evening, it was still light out, enabling him to see the Escalade's license plate. See id. at 130:6-15 (Harvey). Because of the darkly tinted windows, however, Harvey could not identify the driver, tell if the driver was male or female, or estimate how many people were in the car. See id. at 130:25 - 131:8 (Harvey). Because of the median's height, Harvey was unable to turn around fast enough to follow this vehicle and attempt to stop it. See id. at 79:13-16 (Harvey). Harvey did, however, ask APD radio to re-broadcast the ATL

---

[10] Harvey testified that he stopped the other Escalade approximately two or three days before stopping Perea. Because Harvey stopped Perea on October 11th, the Court will assume that this other stop occurred approximately on October 8, 2003 or October 9, 2003.

over the air.  See id. at 79:18-24 (Harvey); id. at 131:13-17 (Harvey).  In the ATL, Harvey included the Escalade's color, make, and license plate, as well as stated that it was in reference to a narcotics transaction and that one of the occupants may be a homicide suspect.  See id. at 79:21-24 (Harvey). Harvey testified that he included the homicide suspect information for the  safety of the officers attempting to locate and to stop the vehicle.  See id. at 79:25 - 80:5 (Harvey).  Harvey did not mention in the ATL, however, anything about the Escalade's driver being suspected of having a firearm or other weapon.  See id. at 131:18-19 (Harvey).

Several hours later, Harvey was eating in a restaurant when he heard on his radio that another officer, APD Officer R. Sedillo, had responded to Harvey's ATL and had spotted a maroon Cadillac Escalade with the license plate "UNM 5558" at a Sonic drive-thru on approximately 64th Street and Central Avenue.  See id. at 80:6-20 (Harvey); id. at 131:20 - 132:5 (Harvey).  Sedillo, however, did not include any information on the Escalade's driver's description or identity.  See id. at 132:9-16 (Harvey).  Harvey and the other officers left the restaurant and drove to the Sonic in an attempt to intercept the Escalade.  See id. at 81:11-13 (Harvey). Without specifying how many other officers were with him, Harvey testified that he told all of the other officers that the Escalade may contain a homicide suspect.  See id. at 81:14-24 (Harvey).

Shortly thereafter, Harvey and five other officers in four police cars arrived at the Sonic and saw the Escalade in question in the Sonic drive-thru.  See id. at 133:14-17 (Harvey).  The officers positioned their patrol cars where they could wait for the Escalade to exit the Sonic.  See id. at 133:5-12 (Harvey).  When the Escalade exited the Sonic, the officers immediately pulled over the Escalade. See id. at 133:18-20 (Harvey); id. at 134:4-6 (Harvey).  Once the Escalade stopped, the officers turned on all of the police vehicles' spotlights so Perea could not see anything behind the bright lights.

-12-

See id. at 83:17-21 (Harvey).  All of the police officers had their guns drawn and trained on the vehicle.  See id. at 134:10-11 (Harvey). One of those officers -- armed with an AR-15 rifle -- was stationed outside a nearby building.  See id. at 84:1-6 (Harvey).  At the time the officers pulled over the Escalade, they did not know the driver's identity. See id. at 132:13-16 (Harvey).

An officer then communicated with Perea over the loudspeaker, informing him that he was a possible suspect in a violent crime and to follow the officer's instructions precisely.  See id. at 84:16 - 85:4 (Harvey).  Perea complied with the officer's requests and turned off his engine, dropped his keys outside of the vehicle, used his left hand to open the vehicle from the outside, and placed both hands up as he stepped out of the vehicle.  See id. at  85:5-21 (Harvey).  Perea -- again following the officer's instructions -- kept both hands in the air and, with one hand, lifted up his shirt from its neck and turned 360 degrees to show the officers he had no weapons.  See id. at 85:22 - 86:17 (Harvey). As instructed by the officer, Perea walked slowly backwards toward the voice, knelt, and placed his hands on the back of his head.  See id. at 86:18 - 87:11 (Harvey).  After complying with the officer's requests, Harvey placed his gun in its holster and approached Perea with a club-type weapon to handcuff him.  See id. at 87:14 - 88:5 (Harvey).  All of the other officers kept their guns drawn and trained as Harvey approached Perea.  See id. at 88:6-9 (Harvey).  Harvey testified that he then handcuffed Perea without using a weapon or without driving Perea to the ground with his knee.  See id. at 88:1-12 (Harvey).  Perea then got up from his knees and walked to a police car with Harvey. See id. at  88:13-24 (Harvey). Harvey patted Perea down to make sure he had no weapons and placed him in his police car's rear seat.  See id.[11]  Once in the back seat, the other officers checked, "or

---

[11] There was no evidence or testimony indicating that Harvey removed Perea's handcuffs before placing him in the vehicle.  To the contrary, there was some testimony elicited on cross that suggested Perea remained in handcuffs.  See Transcript of Hearing at 135:6-8 (Harvey).  The Court

cleared," the Escalade to ensure there were no other occupants in the vehicle.  See id. at 89:21 - 90:3 (Harvey); id. at 134:23 - 135:2 (Harvey).  Once cleared, all of the officers put their guns away, including the officer with the rifle.  See id. at  90:6-10 (Harvey).  None of the police officers discharged his or her gun.  See id. at 101:23-25 (Harvey).  Harvey estimated a total of four minutes elapsed between when the officers stopped Perea's vehicle and placed him in the police car.  See id. at  101:18-22 (Harvey).

Harvey obtained Perea's driver's license and ran a check on him for any warrants.[12]  See id. at 135:3-15 (Harvey); id. at 140:12 - 141:6 (Harvey).  At that point, Harvey discovered that, based on his identification, Perea was not wanted for a homicide.  See id. at 92:19 - 93:9 (Harvey); id. at 141:1-6 (Harvey).[13]  Harvey then approached Perea and explained that Harvey stopped him because he believed there may be a suspect involved in a violent crime with a handgun driving or riding in a vehicle matching the description of Perea's Escalade.  See id. at 89:8-11 (Harvey); id. at 136:16-18 (Harvey).[14]  Harvey testified that, although Perea said that he was "freaking out" because he did not

_____

will, therefore, assume Perea remained handcuffed while in the police vehicle.

[12] At the hearing, there was several exchanges between the United States and Harvey, as well as Perea's counsel and Harvey, to clarify the sequence of events regarding when Harvey ran a check on Perea's identification for any warrants.

[13] Harvey testified that he ran a check on "Jose Perea."  Transcript of Hearing at 140:15-22 (Harvey).  Because there was some information indicating Perea's name may also be "Fabian," Harvey testified that just because "Jose Perea" did have any warrants, it did not rule out that Perea could be the person wanted for homicide.  See id.

[14] When asked why he included the use of a handgun in his reasoning for pulling over Perea, Harvey testified that he included that information because he was under the impression that one of the occupants in the vehicle may have been involved in a homicide, although he did not know what kind of homicide.  See Transcript of Hearing at 136:17 - 137:3 (Harvey).  When the Court asked Harvey, however, what he was thinking when he included a crime involving a handgun in the description for why he stopped Perea, Harvey testified that, because he believed that Perea may have

know why he was pulled over at gunpoint, see id. at 138:2-12 (Harvey), Perea's demeanor was quiet, calm, and very cooperative, see id. at 148:19 - 149:5 (Harvey).  According to Harvey, he spoke to Perea with a soft voice and in a polite manner.  See id. at 148:23-25 (Harvey).  This conversation occurred minutes after the stop was complete and after Perea had been handcuffed and placed in the rear of Harvey's police car.  See id. at 101:9-14 (Harvey).[15]

Harvey then asked Perea for permission to search his car for a firearm, to which Perea responded that Harvey could search his vehicle for firearms.  See id. at 94:10-13 (Harvey).  Harvey explained that, although there was no evidence of the use of a firearm in the October 5th incident, he believed there could be a firearm in the vehicle because, in his training and experience, narcotics dealers often carry firearms.  See id. at 93:13-24 (Harvey); id. at 137:2-3 (Harvey); id. at 139:11-15 (Harvey).  Harvey was under the impression, based on the October 5th incident, that the Escalade's driver was a source of supply for the narcotics involved in the transaction.  See id. at 93:19-24 (Harvey).  In addition, Harvey testified that Perea could have been wanted for homicide.  See id. at 93:24 - 94:3 (Harvey).  Harvey asserted that -- when he asked for consent to search for a firearm -- Harvey believed that there would be a handgun in the vehicle, as opposed to merely bluffing.  See id. at 151:4-8 (Harvey).  Harvey also asked if there were any narcotics in the vehicle, to which Perea replied no.  See id. at 94:21-22 (Harvey).  Harvey then asked to search the vehicle for narcotics and

---

been dealing narcotics, there could have been a handgun in the vehicle.  See id. at 150:19 - 151:8 (Harvey).

[15] The United States presented a belt tape of this conversation, to which the Court listened during the hearing, as well as a transcript, which the Court reviewed before making its determination.

Perea gave Harvey his permission.  See id. at 95:22-24 (Harvey).[16]  According to Harvey, Perea never

withdrew his consent to search the vehicle.  See id. at 100:13-16 (Harvey).  Perea also did not appear

-- based on Harvey's training and experience -- to be under the influence of drugs or alcohol at the

time he provided his consent.  See id. at 100:17 - 101:3 (Harvey).  Moreover, Harvey stated that

Perea understood everything that Harvey asked him.  See id. at 101:4-8 (Harvey).

In his observations of Perea, Harvey noticed that he matched the description that Bassett gave

him of the Escalade's driver who had provided the cocaine to Estrada on October 5, 2003.  See id.

at 90:24 - 91:8 (Harvey).  To verify the conclusion that Perea matched the description that Bassett

and the October 5th ATL had provided, Harvey called Bassett.  See id. at 28:6-8 (Bassett); id. at

52:24 - 53:12 (Bassett); id. at 91:8 - 92:7 (Harvey); id. at 142:13-16 (Harvey).  Harvey informed

Bassett that Harvey had pulled over a vehicle matching the October 5th ATL and believed that one

of the occupants may be wanted for homicide of a police officer.  See id. at 28:12-16 (Bassett).

Harvey then told Bassett that the driver's identification did not show that Perea was wanted for

homicide.  See id. at 28:18-20 (Bassett); id. at 53:14-17 (Bassett).  Bassett asked Harvey if the

person detained was a Hispanic male adult with a shaved head, little pony tail, pronounced jaw line

and was named "Fabian."  See id. at 28:24 - 29:3 (Bassett); id. at 91:17-21 (Harvey); id. at 91:24 -

92:4 (Harvey).  Although Perea matched this physical description, he had identified himself to Harvey

as "Jose Perea."  Id. at 91:22-23 (Harvey).  While talking to Perea, however, Harvey noticed that he

---

[16] Harvey also stated that, although APD consent forms are available, at the time of Perea's
arrest, he did not, like most APD officers conducting street investigations, carry consent forms with
him.  See Transcript of Hearing at 143:18 - 144:14 (Harvey).

wore a belt with the letter "F."  Id. at 102:1-12 (Harvey); id. at 144:15-18 (Harvey).[17]

Bassett testified that Harvey also informed him that Perea gave consent to search the vehicle for narcotics and firearms.  See id. at 30:15-16 (Bassett); id. at 54:7-9 (Bassett).[18]  Bassett told Harvey to search the vehicle's center console for a compartment or removable tray, as that is where Bassett has commonly found narcotics in other searches.  See id. at 30:16-23 (Bassett); id. at 54:9-12 (Bassett).  Bassett, who off duty that night, agreed at Harvey request to come to the location to identify Perea.  See id. at 29:4-11 (Bassett).

After Harvey spoke with Bassett, Harvey searched the vehicle.[19]  Perea remained in the rear of the police car during the search.  See id. at 95:1-3 (Harvey). Harvey's police car was approximately 40 to 50 feet away from the Escalade.  See id. at 95:12-18 (Harvey).  The rear window was left open so Perea could communicate with Harvey during the search if he desired to do so.  See id. at 95:4-8 (Harvey).  Perea did not attempt to communicate with Harvey during the search.  See id. at 95:14-21 (Harvey).  Harvey began his search in the general area that Perea was sitting, focusing his attention on the center console based on Bassett's suggestion that the console is often where

_____

[17] Harvey also explained that he inquired about the "F" on Perea's belt because, in his experience, often Mexicans wear belts with their initials on them, and that he had been informed that the October 5th narcotics investigation subject was named Fabian.  Transcript of Hearing at 102:1-12 (Harvey).  In response, Perea stated that he had put the belt on to go four wheeling.

[18] On cross examination, Harvey testified that he did not recall whether he told Bassett that he had obtained consent to search the vehicle.  See Transcript of Hearing at 142:25 - 143:3 (Harvey).

[19] Harvey's testimony reflects a chronology indicating he did not search the vehicle until after speaking with Bassett.  See Transcript of Hearing at 142:17-20 (Harvey).  When asked why the police report only reflected a call to Bassett after the drugs had been discovered in the vehicle, Harvey testified that he called Bassett back after the vehicle's search, but that his initial call to Bassett is not reflected in the report.  See id. at 143:4-14 (Harvey). By the time Bassett arrived at the scene, Harvey had already searched the vehicle.  See id. at 54:15-19 (Bassett).

narcotics are located.  See id. at 95:11-22 (Harvey).  Harvey discovered approximately one pound

of crack cocaine and approximately $3,500.00 in cash in a compartment in the console.  See id. at

96:23 - 97:25 (Harvey). The officers did not locate a gun in the vehicle.

Harvey then returned to Perea and advised him of his Miranda rights.  See id. at 98:12-16

(Harvey). Perea said he understood those rights and that he did not know how the narcotics got into

his vehicle. See id. at 98:19 - 99:4.  Upon arrival at the scene of Perea's arrest, Bassett identified him

as the same person who handed the cocaine to Estrada on October 5, 2003.  See id. at 29:11-15

(Bassett).[20]  Harvey described Perea's demeanor as compliant, cool and calm throughout the entire

incident.  See id. at 148:7-12 (Harvey).

At the hearing, the United States offered, over Perea's relevancy objection, evidence of

Perea's prior arrests for the purpose of showing his state of mind at the time of the arrest.   See id.

at 154:19-23.  According to Bob Godshall, special agent with the Department of Homeland Security,

Perea was arrested on at least three separate occasions before this incident.  See id. at 158:23 - 160:4

(Godshall).

## PROCEDURAL BACKGROUND

Perea moves the Court, pursuant to the Fourth Amendment of the United States Constitution,

to suppress all evidence, tangible or intangible, seized from him, and all incriminating statements or

omissions made by him, at or about the time of his arrest on October 11, 2003.  Perea requested that

the Court set an evidentiary hearing to explore these issues.

---

[20] The United States also offered testimony by Small in regard to the DEA inventory search
conducted on the vehicle.

## LEGAL ANALYSIS

Perea argues that the police officers did not know whether he, the person driving the vehicle, had been operating the vehicle during the earlier drug transaction. Perea argues that the Fourth Amendment requires probable cause to believe that a person, rather than a vehicle, has committed or is committing a crime. Perea maintains that the alleged involvement of a certain vehicle in criminal activity does not permit police officers to arrest any and all future drivers of that vehicle without first connecting the driver to the previous criminal conduct.

## I.      THE POLICE OFFICERS LAWFULLY DETAINED PEREA.

Perea argues that his consent to search the Escalade was the invalid product of an unlawful arrest and that the Court should suppress the evidence seized as a result of that search.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment applies to seizures of persons. See United States v. Cortez, 449 U.S. 411, 417 (1981). "The Fourth Amendment protects a person's right to be secure against unreasonable seizure." United States v. Perdue, 8 F.3d 1455, 1461 (10th Cir. 1993).

The Fourth Amendment applies to brief investigatory stops of vehicles. See United States v. Cortez, 449 U.S. at 417. In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court of the United States held that police can stop and briefly detain a person for investigative purposes -- known as a "Terry stop" -- if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. See id. at 30. Police may also make a Terry stop if they have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony. See United States v. Hensley, 469 U.S. 221, 229

(1985).  Moreover, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a Terry stop.  See id. at 232.  The level of suspicion required for an investigative stop is less demanding than that for probable cause.  See United States v. Sokolow, 490 U.S. 1, 7 (1989).

As a general rule, "formal arrests or seizures that resemble formal arrests must be supported by probable cause," while the less intrusive investigatory detention involved in a Terry stop may be justified by a lesser standard.  United States v. Perdue, 8 F.3d at 1461.  In this case, the officers immediately resorted to one of the most intrusive of all detentions, seizure at gunpoint.  Perea alleges that the police officers' use of weapons did not stem from a specific threat to the officers' safety, nor probable cause to believe that the Escalade's unidentified driver was committing or had committed a crime.  Perea argues that, because his arrest was not justified by either of these considerations, it was illegal and the Court should suppress all evidence seized as a result.

"To determine whether an investigative detention . . . is reasonable under the Fourth Amendment, the inquiry is twofold.  First, the officer's action must be 'justified at its inception.' . . . The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is 'reasonably related in scope to the circumstances which justified the interference in the first place.'"  United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1993)(quoting United States v. Terry, 392 U.S. at 20).

**A.    THE POLICE OFFICERS HAD REASONABLE SUSPICION TO STOP PEREA AND, THEREFORE, THE STOP WAS JUSTIFIED AT ITS INCEPTION.**

There can be no serious dispute that the police had reasonable suspicion to stop Perea.

Indeed, Perea does not contest that there was reasonable suspicion to stop the Escalade initially, as the facts here show that the officers had reasonable suspicion to stop Perea.  Bassett and Small witnessed what they believed to be a narcotics transaction between Perea and Estrada in the Flying J Truck Stop parking lot.  Bassett observed Estrada place his hand inside Perea's vehicle, and, in return, he handed Estrada a white object.  Upon contacting Estrada, Bassett and Small confirmed their suspicions when they found what was later identified as more than one ounce of cocaine on Estrada.

Based on these facts, Bassett and Small had a reasonable suspicion that Perea had engaged in an illegal narcotics transaction and were thus justified in putting out an ATL on Perea's Escalade.  Accordingly, Harvey and the other officers were constitutionally permitted to conduct an investigatory stop of Perea's vehicle based on the attempt to locate.  See United States v. Hensley, 469 U.S. at 232 (holding that investigatory stop of defendant in reliance on another police department's "wanted flyer," which was issued on basis of articulable facts supporting a reasonable suspicion that person wanted had committed an offense, was constitutionally permissible); United States v. Gonzales, 897 F.2d 504, 506 (10th Cir. 1990)(holding that border patrol stop of car based upon a BOLO -- "be on the lookout for" -- bulletin issued by DEA agent was proper where DEA agent had sufficient articulable facts on which to base reasonable suspicion).

## B.    THE _TERRY_ STOP WAS REASONABLE IN SCOPE AND FORCE.

Although Perea concedes that the officers had reasonable suspicion to stop his vehicle, he argues that the officers' stop of him at gunpoint transformed the investigatory stop into an unlawful arrest.  The facts of this case demonstrate, however, that the stop of Perea was not only reasonable at its inception, but also as conducted.

-21-

In "most scenarios," when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause. United States v. Perdue, 8 F.3d at 1463.  There does exist, however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  "The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection."  Id. at 1462 (quoting United States v. Merritt, 695 F.2d 1263, 1273 (10th Cir. 1982)).  As Tenth Circuit case law has demonstrated, only when there is evidence to support a reasonable belief that such a threat exists will a detention involving the use of guns continue to be considered a Terry stop rather than an arrest.

The Tenth Circuit requires a specific threat to officer safety before it is willing to determine that a stop involving the use of guns was reasonable.  See  United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)(holding that reasonableness of felony stop was predicated, in part, on informant's tip that at least one of the occupants of the vehicle may be armed);  United States v. Perdue, 8 F.3d at 1458, 1463-64 (holding that the officers acted reasonably when they executed a Terry stop with their weapons drawn where weapons had been discovered on the property); United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(concluding that the officers display of firearms was reasonable where officers had been informed that the suspect had threatened to kill someone, and had observed suspect violently pounding the interior of his truck with his fists).  In contrast, when there exists no specific threat to officer safety, the Tenth Circuit refuses to consider the use of guns a reasonable exercise of precaution and considers such a stop an arrest.  See United States v. Melendez-Garcia, 28 F.3d 1046, 1051-53; United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993).

In <u>Melendez-Garcia</u>, the Tenth Circuit observed that "there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the <u>Terry</u> stop." 28 F.3d at 1052-53. The Tenth Circuit further noted that "[t]he government does not explain or offer evidence to support an explanation why the officers in this case needed to execute a 'felony stop.'" <u>Id.</u> at 1053. In the absence of factors that justified the use of guns in other cases, the Tenth Circuit held that the government failed to satisfy "its burden of showing that, under the totality of the circumstances, the intrusiveness of this seizure was reasonably necessary for officer safety." <u>Id.</u> Accordingly, the Tenth Circuit treated the stop as an arrest and required a showing of probable cause to save it from illegality. <u>See id.</u>

The scope of police activities permitted during a <u>Terry</u> stop must be reasonably related to the circumstances that initially justified the detention. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. at 19 ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.")(quotations omitted); <u>United States v. Merritt</u>, 695 F.2d at 1272. A court will uphold the intrusiveness of a search or seizure if it was reasonable under the totality of the circumstances. <u>See</u> <u>United States v. Perdue</u>, 8 F.3d at 1462 (citing <u>Terry v. Ohio</u>, 392 U.S. at 19). Courts have determined that, if reasonable suspicion exists, police may detain a person to determine his identity. <u>See</u>, <u>e.g.</u>, <u>Terry v. Ohio</u>, 392 U.S. at 22-23.

Police may also order an individual out of a vehicle that they have lawfully detained pursuant to a routine <u>Terry</u> stop, whether or not the police have reasonable suspicion that the individual has engaged in criminal activity. <u>See</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977)(<u>per curiam</u>); <u>United States v. Merritt</u>, 695 F.2d at 1273. As the Tenth Circuit noted, "the intrusion into the

driver's personal liberty is justified 'as a precautionary measure to afford a degree of protection to the officer." Id. (quoting Pennsylvania v. Mimms, 434 U.S. at 110). Moreover, the Tenth Circuit has also held that the use of guns during an investigative stop is permissible where the police reasonably believe that the weapons are necessary for their protection. See United States v. Merritt, 695 F.2d at 1273.

The United States is entitled to rely on the officers' collective knowledge to support both reasonable suspicion for the Terry stop and probable cause for Perea's arrest.

> In assessing whether the police in this case had sufficient justification to make an investigatory stop we must, of course, look to the knowledge of all the police involved in this criminal investigation, since probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest.

United States v. Merritt, 695 F.2d at 1268 (internal quotations omitted). The Tenth Circuit went on to hold at footnote 9: "[W]e have held that probable cause for an arrest may be based on the collective knowledge of the police. We hold that the principle applies identically where the collective knowledge of the police forms the basis for a stop." Id. at 1268 n.9.

The Tenth Circuit noted that police officers face a dangerous dilemma in situations where suspicion does not rise to the level of probable cause. If the officer approaches the suspect with his gun still in his holster, he increases the risk that he will be shot. On the other hand, if he protects himself by drawing his gun, he increases the risk that a court will set the criminal free by construing his action as an illegal arrest. See id. at 1273. Accordingly, the Tenth Circuit held that, where police have reasonable suspicion that an occupant of a vehicle may be armed and dangerous, the police act reasonably in pointing guns on the suspect during the course of the stop. See id. As the Tenth Circuit stated: "We find that the incremental intrusion visited upon a citizen's personal security by

-24-

having a gun pointed at him instead of merely drawn . . . is outweighed by the increased protection the police afford themselves by making certain of their safety in face of the danger presented." Id. at 1274.

In this case, Perea was detained in a lawful Terry stop when APD officers trained their guns at him and ordered him to exit his vehicle. There was a reasonable basis for the use of guns, however, because the officers had a reasonable belief that their safety was in danger. The officers had identified the Escalade as the vehicle used in an illegal narcotics transaction. The police verified the Escalade at the Sonic as the same Escalade in the earlier drug transaction by model, color, and license plate. Moreover, the officers believed, although incorrectly, that the driver of the Escalade was possibly wanted in reference to a murder investigation. These facts justify the officers' belief that the Escalade's driver might be armed and dangerous. See United States v. Melendez-Garcia, 28 F.3d at 1052-53 (10th Cir. 1994)(noting that drugs, guns, and violence often go together and might be a factor tending to support officer's claim of reasonableness where there is evidence that police had reason to believe particular suspect was violent).

Contrary to Perea's argument, the officers' knowledge of the driver's possible connection to a homicide, especially when considered in conjunction with their knowledge of the driver's involvement in an illegal narcotics transaction, provided the officers with strong reason to believe that their safety might be in jeopardy.[21] The law does not support Perea's position that the agents should have ignored the information about the driver's connection to a homicide and treated the stop as an ordinary traffic stop; such a response would have required the officers to unnecessarily risk their

---

[21] The officers' belief that a homicide suspect may be an occupant in the vehicle distinguishes this case from the Melendez-Garcia case, which lacked any such belief or suspicion of a possible threat to officer safety. See 28 F.3d at 1052-53.

safety.  As the Tenth Circuit has indicated, "agents 'need not be absolutely certain that the individual is armed' before taking protective measures."  United States v. Gama-Bastidas, 142 F.3d at 1240 (quoting Terry v. Ohio, 392 U.S. at 27).

Other Tenth Circuit cases have upheld the use of guns and handcuffs during a Terry stop in similar circumstances.  See United States  v. Gama-Bastidas, 142 F.3d at 1240 (concluding that felony stop was reasonable where informant's tip indicated that one of  vehicle's occupants may be armed); United States v. Perdue, 8 F.3d at 1463 (holding that officers where justified in pointing guns at defendant during Terry stop where officers knew that guns were found on property where marijuana was being cultivated and defendant was stopped on rural road near property); United States v. Merkley, 988 F.2d at 1064 (upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and suspect was pounding interior of truck with his fists).  The facts in this case -- that the officers suspected Perea of being involved in separate narcotics and murder investigations -- do not indicate as dangerous situation as in Merkley, where that defendant was overheard threatening to kill someone and seen pounding his fists on the steering wheel.  See id. at 1064.  Nonetheless, the officers had a belief that a suspect wanted for homicide may have been in the Escalade, and it was reasonable to conduct a felony stop and place Perea in handcuffs in the rear seat of a police car.[22]

Perea contends that the officers could not rely on the information about his connection to a homicide because the information later proved to be inaccurate.  This argument lacks support in Tenth Circuit law.  The Tenth Circuit has held that "[a] mistaken premise can furnish grounds for a

---

[22] The Court did not decide at the hearing and in its Order whether, at this point in the incident, the police had probable cause to arrest Perea, and the Court declines to decide that issue in this memorandum.

Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it."

United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996)(internal quotation omitted). Here,

the officers acted reasonably in executing a felony stop based on the circumstances, even though it

was later determined that Perea was not a murder suspect. See United States v. Lang, 81 F.3d 955,

965-66 (10th Cir. 1996)(holding that stop of defendant's vehicle and pat-down search of defendants

were reasonable even though officers were incorrect in their belief that vehicle contained robbery-

murder suspect).

Finally, Perea attempts to separate the officers' knowledge of the Escalade's use in the illegal

narcotics transaction from the officers' knowledge about him, arguing that the officers, before using

weapons to execute the stop, must have first identified the driver of the stopped Escalade as the same

person who conducted the illegal drug transaction in the Escalade days earlier. The Court does not

agree with Perea for several reasons. First, it was reasonable for the officers to deduce that the

Escalade's driver during the narcotics transaction six days earlier was the same Escalade's driver

observed at the Sonic. The vehicle was the same model and color, and had the same license plate as

the Escalade used in the narcotics transaction.

Furthermore, the attempt to locate also gave a physical description of the driver and a possible

alias of "Fabian." The officers thus had information upon which to make a positive identification of

the driver. The officers, however, were unable to make an identification until the driver exited his

vehicle because the Escalade's side windows were heavily tinted and it was night. Given what they

knew, the officers acted reasonably in pointing their guns at the driver while he exited the vehicle to

determine whether the driver was the suspect for whom they were looking. Once Perea exited the

Escalade, the officers were then in a position to see that the driver matched the physical description

of the suspect in the narcotics transaction.  Moreover, once placed in the police car, Harvey noticed that the driver wore a belt with the initial "F" (Fabian).

Accordingly, given that the officers believed that Perea and his Escalade matched the person and vehicle involved in the narcotics transaction, and that the suspect was involved in a homicide, it was reasonable for the officers to place Perea in handcuffs for their safety while they conducted their brief investigative questioning of him to establish his identity and to dispel their reasonable suspicions of criminal activity.  See Terry v. Ohio, 392 U.S. at 6-7, 22-23.[23]  The officers thus did not transform their investigative detention of Perea into an arrest when they used guns, placed him in handcuffs, and put him in the police car.[24]

The Court finds, therefore, that the officers conducted a lawful Terry stop of Perea.

## II.    PEREA PROVIDED VOLUNTARY CONSENT TO SEARCH HIS VEHICLE.

Perea argues that, if the Court determines that the police officers lawfully executed Perea's detention, the Court should still suppress the evidence as fruit of an involuntary consent to search.

---

[23] The Court rejects Perea's argument that the officer's lacked probable cause because the officers focused on the description of the vehicle, as opposed to the driver's identity.  This argument fails for several reasons.  First, because the Terry stop was reasonable in its inception, the officers needed only a reasonable suspicion to stop the vehicle, not probable cause.  Second, the officers relied only on the vehicle's description to the extent that it provided reasonable suspicion.  This case is distinguishable on its facts from a case upon which Perea relies, United States v. Green, 879 F.Supp. 60 (W.D. Tex. 1995), in that the officers in this case did not have a chance to observe Perea before conducting the felony stop and having Perea exit the vehicle, see id. at 63.

[24] Perea also argues that one officer's observation that the windows to the Escalade were darkly tinted does not provide probable cause to arrest the driver.  Perea contends that, failing to establish probable cause before arresting him, the officers effectuated an illegal arrest, which tainted any consent to search that Perea provided and compels suppression of all evidence stemming therefrom.  The Court, however, having held that the officers' actions constituted a valid Terry stop that was reasonable in its inception and in its scope need not reach the question of probable cause relating to the initial detention of Perea.

Having reviewed the evidence presented at the hearing on the motion to suppress, including listening to the belt tape containing the conversation between Harvey and Perea, the Court concludes that Perea's consent was voluntary.[25]

The government -- if relying on consent to search -- bears the burden of proving that the consent was freely and voluntarily given. See United States v. Sandoval, 29 F.3d 537, 539 (10th Cir. 1994). The court must look at the totality of the circumstances to determine whether the consent was voluntary. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). "[T]he court[] indulge[s] every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived." United States v. Muldrow, 19 F.3d 1332, 1336 (10th Cir. 1994). "In determining voluntariness, [a court] consider[s] whether the consent was unequivocal and specific and freely and intelligently given, and whether it was given without duress or coercion." United States v. Mendez,118 F.3d 1426, 1432 (10th Cir. 1997). See United States v. Pena, 143 F3d 1363, 1366 (10th Cir. 1998); United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). "Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent. More general considerations include

---

[25] The Court need not discuss whether the doctrine of inevitable discovery would allow the admission of the evidence, having held that the investigatory detention was reasonable in its inception and scope and that Perea gave voluntary consent to search his vehicle. Moreover, because, at the time Harvey solicited Perea's consent to search his vehicle, the officers were lawfully detaining him, the Court need not resolve the issue whether an unlawful detention or arrest tainted the consent. See United States v. Knox, No. 94-4218, 1995 WL 736268, at **4 (10th Cir. Dec. 7, 1995)(unpublished decision)("[T]he officers had reasonable suspicion to briefly detain the Defendant to determine his purpose within the zone of the police operation. Information volunteered during the completion of a valid Terry stop, coupled with seeing ammunition in plain view in the car, created information sufficient to justify expanding the Terry-type inquiry to the issue of possession of illegal weapons. No prior taint attaches because his detention at that point was lawful.").

whether the consenting party was advised of his or her constitutional rights and whether permission

to search was obtained by coercive means or under inherently coercive circumstances." United States

v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)(citing Schneckloth v. Bustamonte, 412 U.S. at 226).

In this case, Harvey solicited consent when Perea had been detained for a very short period

of time.  In asking for Perea's consent, there is no evidence that Harvey physically mistreated,

threatened, or made promises to him.  The Court also finds that Perea's demeanor -- which Harvey

described as calm and cooperative -- indicates that he did not feel as though he was under undue

pressure or subject to coercion at the time he offered his consent to search the vehicle.  Moreover,

when  Harvey asked separately for consent to search for firearms and consent to search for narcotics,

Perea gave a separate, affirmative answer to each questions, indicating his consent was specific and

unequivocal.  In addition, Perea appeared to not be under the influence of alcohol or drugs, and to

otherwise fully understand what Harvey was requesting.

The fact that, when Harvey solicited Perea's consent, he was in handcuffs in the police car's

backseat does not automatically render the consent involuntary.  The United States Court of Appeals

for the Seventh Circuit upheld the voluntariness of consent to search his home even though consent

was given while the defendant was handcuffed in the back of a police car outside of the house.  See

United States v. Strache, 202 F.3d 980, 986 (7th Cir. 2000).[26]  In holding that the consent in United

States v. Strache was voluntary, the Seventh Circuit explained: "[C]ustody is not dispositive so long

as the potentially coercive effect of custody was mitigated by the circumstances.  [The Defendant]

was handcuffed, but the police did not badger him for information or consent, nor physically abuse

---

[26] For the purposes of evaluating voluntariness of consent, the Court will assume that the same
standard applies regardless of the object, i.e. whether a vehicle or a home, for which consent is
sought.

or pressure him.  [The Defendant] had been in police custody for only twenty minutes when he

consented to search, and the district court concluded that 'everything proceeded calmly, cordially and

cooperatively.'"  Id. (citations omitted).  Moreover, that the officers initially detained Perea at

gunpoint is not sufficient to invalidate his consent's voluntariness.  At the time he gave the consent,

all the officers -- including Harvey -- had holstered their guns, Harvey spoke to Perea in a polite tone,

and he appeared calm and cooperative.[27]

Moreover, the fact that Harvey did not inform Perea of his right to refuse consent does not

render the consent involuntary.[28]  To the contrary, the Supreme Court, in Schneckloth v. Bustamonte,

rejecting a requirement that the government must affirmatively show that the defendant knew he had

a right to refuse consent, explained: "While knowledge of the right to refuse consent is one factor to

be taken into account, the government need not establish such knowledge as the sine qua non of an

effective consent." 412 U.S. at 227.  Some courts, however, have considered "whether the defendant

had experienced prior arrests so that he was aware of the protections the legal system affords to

suspected criminals" in evaluating whether a consent was voluntary.  United States v. Mancias, 350

F.3d 800, 805 (8th Cir. 2003).  "[T]he defendant's 'prior encounter with the criminal justice system

increased [the defendant's] awareness of the rights of accused persons.'"  Id. (quoting United States

v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990)).  At the hearing, the United States offered evidence

that Perea had been arrested on at least three prior occasions.  Although this evidence is not

_____

[27] These facts distinguish this case from that of United States v. Perdue, in which the officers
-- with their guns still drawn -- asked the defendant questions while lying face down on the ground.
8 F.3d at 1459.

[28] Nor does the fact that Perea did not sign a consent form render the consent involuntary.
See United States v. Barnett, 989 F.2d at 555 ("Written consent is not essential to the establishment
of a valid consensual search.")

conclusive on the consent's voluntariness, it is a relevant factor for the Court to consider.

The Court concludes that, based on the totality of the circumstances, Perea's consent was voluntary in that it was free of duress or coercion, it was specific and unequivocal, and it was freely and intelligently given.  Because Perea was lawfully detained at the time he proffered the consent, the Court will deny the Defendant's Motion to Suppress.

**IT IS ORDERED** that the Defendant's Motion to Suppress is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney
    for the District of New Mexico
James D. Tierney
  Assistant United States Attorney
Albuquerque, New Mexico

*Attorneys for the United States*

Billy R. Blackburn
Mark Fine
Albuquerque, New Mexico

*Attorneys for the Defendant*